**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                     No. CR 19-3726 JB

JONATHAN GOMEZ,

        Defendant.

<u>**MEMORANDUM OPINION AND ORDER**</u>[1]

**THIS MATTER** comes before the Court on the Defendant's Objections to Presentence Report, filed February 10, 2021 (Doc. 93)("Objections").  The primary issues are seven factual objections and one legal objection: (i) whether Defendant Jonathan Gomez told M.A.[2] that the Syndicato Nuevo Mexico gang ("SNM") leader Anthony Ray Baca, a.k.a. "Pup," ordered J.M. to be killed; (ii) whether Gomez put a hit on M.A. before July, 2012; (iii) whether Gomez ordered Benjamin Clark to murder Vernon Clark; (iv) whether, sometime after March, 2014, Gomez sent a letter to Rudy Perez reassuring him that Gomez did not think Perez had snitched against SNM about J.M.'s murder; (v) whether, on Baca's behalf, Gomez ordered SNM member Conrad Villegas to assault J.R.; (vi) whether Gomez was an influential member of the SNM gang;

---

[1]The Court does not choose to file this Memorandum Opinion and Order under seal. Because Gomez moves to seal some of the United States exhibits, however, <u>see</u> Motion to Seal Exhibits to Reply to Government's Response to Defendant's Objections to the Pre-Sentencing Investigation Report, filed May 20, 2021 (Doc. 105), the Court can, at the parties' request, file this Memorandum Opinion and Order under seal.

[2]Although the full names of some of the people involved in this case appear in some of the relevant documents, the Court chooses to use initials when the United States Probation Office, in the Presentence Investigation Report, uses initials.  <u>See</u> Presentence Investigation Report, filed January 20, 2021 (Doc. 88).

(vii) whether Gomez was Baca's right-hand man; and (viii) whether the Court can apply a 2-level sentencing reduction under United States Sentencing Guidelines ("U.S.S.G.") § 3E1.1, because Gomez has accepted responsibility for his criminal behavior, even though he had an eight-inch sharpened metal instrument in his jail cell. The Court concludes that: (i) Gomez told M.A. that Baca ordered J.M. to be killed; (ii) Gomez did not put a hit on M.A. before July, 2012; (iii) Gomez ordered Benjamin Clark to murder Vernon Clark; (iv) sometime after March, 2014 Gomez sent a letter to Rudy Perez reassuring him that Gomez did not think Perez snitched against SNM about J.M.'s murder; (v) on Baca's behalf, Gomez ordered Villegas to assault J.R.; (vi) Gomez was an influential member of the SNM gang; and (vii) Gomez was Baca's right-hand man; (viii) Gomez has withdrawn from his associations with SNM, and his possession of the eight-inch sharpened metal instrument does not show that he does not accept responsibility; therefore, he is entitled to U.S.S.G. § 3E1.1's 2-level sentencing reduction. The Court will, therefore, sustain in part and overrule in part the Objections.

## **FINDINGS OF FACT**

The Court takes its facts from the United States Probation Office's ("USPO") Presentence Investigation Report, filed January 20, 2021 (Doc. 88)("PSR"), the Objections, the United States' Response to Defendant's Objection to the Presentence Report, filed May 6, 2021 (Doc. 102)("Response"),[3] the Addendum to the Presentence Report, filed April 29, 2021 (Doc.

---

[3]Gomez moves to strike the Response. See Motion to Strike Government's Response to Defendant's Objections to the Pre-sentence Investigation Report, filed May 20, 2021 (Doc. 104)("Motion"). Gomez argues that the Court should strike the Response, because plaintiff United States of America filed the Response on May 6, 2021, see Motion at 2, over two months after March 1, 2021, the deadline the Court imposed for the United States to file a response, see Order Granting Extension of Time to File Response, filed March 22, 2021 (Doc. 97). Gomez argues that the Response is not timely under rules 32 and 45 of the Federal Rules of Criminal Procedure, and under D.N.M.LR-Cr. 47.8(a). See Motion at 2-3. The United States argues that the Court should not strike the Response, because, under rule 45(b)(1), or D.N.M. LR-CR. 47.8, the United States

100)("Addendum"), and Gomez's Reply to the Government's Response to Defendant's Objections

to the Pre-sentence Investigative Report, filed May 20, 2021 (Doc. 106)("Reply").   The Court

makes its findings of fact by a preponderance of the evidence.   See United States v. Williams, No.

CR. 17-2556 JB, 2020 WL 4016108, at *6 (D.N.M. July 16, 2020)(Browning, J.)(citing United

States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)).   Accord United States v. Zapata, 546 F.3d

1179, 1192 (10th Cir. 2008).   The Court may rely on hearsay if the hearsay is reliable.   See United

States v. Banda, 168 F. App'x 284, 289 (10th Cir. 2006)(unpublished)("[T]here is no prohibition

on considering hearsay testimony at sentencing, provided it bears indicia of reliability.").[4]   The

---

can show excusable neglect.   See United States' Response to Defendant's Motion to Strike
Government's Response to Defendant's Objections to the Pre-Sentence Investigation Report (Doc.
104) and to the Defendant's Response to the Government's Motion for Extension of Time to File
Response (Doc. 109) at 107, filed June 14, 2021 (Doc. 110).   The Court denies the Motion, because
the United States' work on the United States v. Martinez, No. CR 19-3725, trial qualifies as
excusable neglect, and the late filing does not prejudice Gomez.   See Fed. R. Crim. P. 45(b)(1)(B);
D.N.M.LR-Cr. 47.8(a).   The Court always lets parties have a full opportunity to say what they
want on an issue; Gomez may file a sur-reply, send the Court a letter, and argue orally at the
sentencing hearing.   Because Gomez could not file a reply until after the United States filed its
Response, the Court also will consider Gomez's Reply to the Government's Response to
Defendant's Objections to the Pre-sentence Investigative Report, filed May 20, 2021 (Doc. 106).

   [4]United States v. Banda is an unpublished opinion, but the Court can rely on an unpublished
opinion from the United States Court of Appeals for the Tenth Circuit to the extent its reasoned
analysis is persuasive in the case before it.   See 10th Cir. R. 32.1(A)("Unpublished decisions are
not precedential, but may be cited for their persuasive value.").   The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent. . . .   And we
> have generally determined that citation to unpublished opinions is not favored.
> However, if an unpublished opinion or order and judgment has persuasive value
> with respect to a material issue in a case and would assist the court in its disposition,
> we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).   The Court concludes that United
States v. Banda, and the other unpublished opinions cited herein have persuasive value with respect
to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and
Order.

evidence and information upon which the Court relies must have sufficient indicia of reliability. See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

**1.      Background on the SNM.**

1.      This case is one of many that stems from an investigation that the Federal Bureau of Investigation ("FBI"), New Mexico Corrections Department ("NMCD"), and the Bernalillo County Sheriff's Office ("BCSO") jointly have conducted into SNM, a powerful and violent prison gang that formed in February 1980 after a prison riot at the Penitentiary of New Mexico in Santa Fe, New Mexico ("PNM").  See PSR ¶ 11, at 7.

2.      Shortly after the prison riot in February 1980, "prison gangs such as the SNM and Los Carnales began to emerge within the [NMCD]."  PSR ¶ 11, at 7.

3.      SNM and Los Carnales "began to organize themselves and focused primarily on gaining their own status within the correctional institutions by employing violence upon the inmate population to assume a position of leadership and control."  PSR ¶ 11, at 7.

4.      SNM "expanded throughout the New Mexico penal system and has bolstered [sic] as many as 500 members since the 1980s."  PSR ¶ 11, at 7.

5.      "The SNM gang operates under a 'panel' or 'mesa' (Spanish for table) of leaders who issue orders to subordinate gang members."  PSR ¶ 12, at 7.

6.      "Despite being imprisoned and being closely scrutinized by prison officials, SNM gang leaders managed to convey orders to SNM gang members and associates throughout the prison system through a variety of means, including secret notes called 'kites' or 'welas,' coded

letters, and messages conveyed by complicit visitors." PSR ¶ 12, at 7.

7.      "These messages would provide SNM gang members with the gang's operational strategies to facilitate their illegal criminal activities within the penal system." PSR ¶ 12, at 7.

8.      "SNM gang members discussed the proposed actions to be taken on those who cooperated against SNM gang members and associates, to include plans and agreements regarding the commission of future crimes, which involved murders, drug distribution, possession of firearms, and assaults, as well as ways to conceal these acts." PSR ¶ 13, at 7.

9.      Throughout its existence,

> SNM gang members provided information and financial support to other members and associates of the enterprise, including those who were incarcerated, for the purpose of committing criminal acts. SNM gang members are bound to protect the enterprise's members and associates who commit crimes by hindering, obstructing, and preventing law enforcement officers from identifying, apprehending, and successfully prosecuting and punishing the offenders.

PSR ¶ 13, at 7.

10.     "During the mid-1980s through 2014, high-ranking SNM gang members ordered numerous assaults and murders of other SNM gang members and rival gang members within the NMCD, as well as assaults on correctional officers." PSR ¶ 14, at 8.

11.     "From July 5, 1988, through September 28, 2014, at least 15 homicides and/or assaults occurred within the NMCD and Metropolitan Detention Center in Bernalillo County, each of which have been directly tied to the SNM gang." PSR ¶ 14, at 8.

12.     "As a result of these murders and assaults, the SNM gang was locked down, and SNM gang leadership were transferred to out-of-state institutions." PSR ¶ 14, at 8.

13.     "Due to these lockdowns and transfers, the SNM gang leadership felt they were being unjustly punished by the NMCD Cabinet Secretary." PSR ¶ 15, at 8.

14.     The belief that SNM gang leadership was being unjustly punished "was based on

the fact that the Cabinet Secretary's previous career as a BCSO Commander was instrumental in the investigation, prosecution, and conviction of SNM gang member Michael Astorga for the murder of BCSO Deputy Jim McGrane." PSR ¶ 15, at 8.

15.   The SNM gang leadership used the fact that NMCD Cabinet Secretary Gregg Marcantel previously was employed as a BCSO commander "to propagate within its membership that the Cabinet Secretary was using his position to advance a personal agenda against the SNM gang." PSR ¶ 15, at 8.

16.   "In March 2015, a high-ranking official with NMCD advised he had a credible and reliable source claiming there was an active hit placed on Marcantel and Security Threat Intelligence Unit (STIU) Administrator Dwayne Santistevan by SNM gang leadership." PSR ¶ 16, at 8.

17.   Between March, 2015, and May, 2015, "NMCD personnel intercepted three letters, to and from SNM gang members, discussing the hit against the Cabinet Secretary and STIU Administrator." PSR ¶ 16, at 8.

18.   The threat on Marcentel and Santistevan "culminated in late 2015, when incarcerated SNM leaders directed members on the street to acquire firearms and kill the NMCD officials." PSR ¶ 16, at 8.

19.   "The FBI investigation led to the indictment of forty SNM members in December 2015 on federal charges related to Violent Crimes in Aid of Racketeering (VICAR)[5] and RICO[6]

---

[5]A Violent Crimes in Aid of Racketeering Act, 18 U.S.C. § 1959 ("VICAR") violation requires an underlying state-law offense, i.e., someone "murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do." 18 U.S.C. § 1959(a). See 18 U.S.C. §§ 1961-1968.

[6]The Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961-68 ("RICO"),

offenses."  PSR ¶ 17, at 8.

20.     "In April 2016, another 39 members and associates were additionally indicted."
PSR ¶ 17, at 8.

21.     By April, 2016, "approximately 127 individuals have been arrested in relation to
this investigation."  PSR ¶ 17, at 8.

22.     "The FBI continues to monitor the SNM organization and target members of the
organization engaged in on-going criminal activity."  PSR ¶ 17, at 8.

**2.      Gomez' Involvement with the SNM.**

23.     Gomez, a.k.a. "Baby G." was incarcerated in NMCD between 2004 and September,
2019.  See PSR ¶ 19, at 9.

24.     Gomez was a SNM member while he was incarcerated between 2004 and 2019.
See PSR ¶ 19, at 9.

25.     Together with other SNM members, Gomez conspired to assist the SNM gang with
its affairs and aims, which included multiple acts of murder, robbery, drug trafficking, and witness
tampering and retaliation.  See PSR ¶ 19, at 9.

26.     On May 5, 2002, Gomez had an approximately eight-inch hacksaw blade hidden
under the insole of a black shoe in his prison cell.  See PSR ¶ 21, at 9.

27.     Gomez admitted the hacksaw blade belonged to him, and claimed he found it in the
recreation yard.  See PSR ¶ 21, at 9.

28.     At approximately 5:31 p.m. on July 11, 2002, Gomez, with other SNM members,

_____

prohibits specific activities when they are committed in connection with a pattern of racketeering
activity.  E.g., 18 U.S.C. § 1962(b) ("It shall be unlawful for any person through a pattern of
racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or
indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which
affect, interstate or foreign commerce.").

protested the lack of air conditioning in his unit by "kicking and banging on his cell door."  PSR ¶ 22, at 9.

29.     Corrections officers wanted Gomez to stop kicking and banging on his cell door, so they "ordered Gomez to turn around and be handcuffed" but, when Gomez did not comply, they "administered a dose of chemical agents into the cell."  PSR ¶ 22, at 9.

30.     Sometime before 2003, a SNM faction ordered inmate J.R. to be killed, because J.R. had a sexual relationship with the wife of Gerald Archuleta; Archuleta was a leader within SNM.  See PSR ¶ 46, at 13.

31.     In March, 2003, on Archuleta's orders, SNM member F.M. shot Gomez in the leg during a drive-by shooting.  See PSR ¶ 46, at 13.

32.     On July 14, 2003, Gomez and J.G., a fellow SNM member, had a disagreement over a card came, which resulted in Gomez sustaining two bite marks on his chest and stomach, a black eye, and a scratch on his temple, and J.G. sustaining minor bruising.  See PSR ¶ 23, at 9.

33.     On June 16, 2006, Gomez was "violently assaulted by several inmates (primarily Michael Padilla) due to his suspected membership with the SNM," which gave Gomez a "large laceration to his head and bruising to his face and torso."  PSR ¶ 24, at 10.

34.     Corrections officers "administered two gas canisters into the pod to stop the assault."  PSR ¶ 24, at 10.

35.     On June 25, 2006, Gomez wrote a letter to SNM member J.R., in which he discussed "gang politics between the SNM and Los Padillas gang."  PSR ¶ 25, at 10.

36.     In the letter, Gomez writes, "'I was telling you yesterday that Jeffery (Jeffery Padilla, Los Padillas Leader) is one of the ones who was dropping wilas[7] on me and telling those

---

[7]"Wila" is an informal Spanish word for "girl" or "prostitute."

vatos[8] where I'm from,' referring to being from the SNM," and that he "'fought about 20 vatos, didn't' know who they were.  I stuck one of them, not too good, but got one.  I got a cut on my head from a broom and a black eye, nada really.'"  PSR ¶ 25, at 10 (no citation for quotations).

37.     On February 11, 2007, Gomez wrote a letter to SNM member G.M. in which he discusses another SNM member's whereabouts.  See PSR ¶ 26, at 10.

38.     NMCD employees intercepted the February 11, 2007, letter on February 12, 2007, and found that it included "general pleasantries, as well as conversation about the whereabouts and status of various SNM members and associates."  PSR ¶ 26, at 10.

39.     On December 15, 2009, Gomez' urine sample tested positive for opiates, even though Gomez denied using drugs.  See PSR ¶ 27, at 10.

40.     Sometime after 2001, Gomez signed a petition to NMCD officials to release SNM gang leader Baca from segregation; the petition "stated that rumors of internal conflict within the gang were false" and "was intended to show solidarity among the gang and respect for Baca."  PSR ¶ 28, at 10.

41.     In 2008, Baca and Gomez were housed next to each other, and developed a close relationship.  See PSR ¶ 31, at 11.

42.     Gomez was Baca's "'right hand man.'"[9]  PSR ¶ 31, at 11.

---

[8]"Vato" is an informal Spanish word for "man."

[9]The PSR states that Gomez was Baca's "right-hand man.  See PSR ¶ 31, at 11.  Gomez objects to this fact, but does not explain why.  See Objections at 4, 5, 10.  The USPO notes that Gomez told a confidential informant that "'he was Baca's right hand man and told him how they [Gomez and Baca] were neighbors and would speak via the vent.'"  Addendum at 2 (quoting FBI Report at 3, filed May 6, 2021 (Doc. 103-5).  Although the Court cannot rely only on the PSR if a party objects, see United States v. Farnsworth, 92 F.3d 1001, 1011 (10th Cir. 1996), the Court concludes that Gomez was Baca's right-hand man, because a confidential informant told the FBI that he was Baca's right-hand man, and Gomez offers no reason to doubt the veracity of the FBI

43.    Gomez wanted to be elevated to the top of SNM.  See PSR ¶ 32, at 11.

44.    Sometime before July, 2012, Gomez told M.A. that Baca wanted J.M. killed and that it was to be done on Baca's orders.  PSR ¶ 29, at 10.[10]

45.    M.A. was housed in the same unit as Gomez and J.M., Gomez told M.A. that Baca wanted J.M. to be "'hit,' because of 'paperwork.'"  PSR ¶ 29, at 10 (no citation for quotation).

46.    Gomez could not produce the "'paperwork'" when M.A. asked to see it, so M.A. told Gomez that, without the paperwork, he would not allow J.M. to be harmed.  PSR ¶ 29, at 10 (no citation for quotation).

47.    M.A. also held a leadership role in SNM and told his subordinates not to harm J.M. See PSR ¶ 29, at 10.

48.    On March 7, 2014, SNM members killed J.M. at Southern New Mexico Correctional Facility ("Southern NM") in Las Cruces, New Mexico.  See PSR ¶ 30, at 11.

49.    J.M. was a SNM member, and other SNM members stabbed J.M. to death, because he was cooperating with law enforcement.  See PSR ¶ 30, at 11.

50.    The SNM members killed J.M. in his cell, which only had one entrance, so he was

---

report, see Objections at 1-11.

     [10]The PSR states that, in February, 2018, M.A. testified against SNM, during which he said that Gomez "relayed" that Baca "wanted J.M. to be 'hit' because of 'paperwork.'"  See PSR ¶ 29, at 10 (no citation for quotations).  Gomez objects to this fact, because it is based on M.A.'s statements "appear[] to be based solely on [M.A.'s] uncorroborated 'debriefing' statements to the FBI that were the basis of his testimony at the previous SNM trial."  Objections at 3 (no citation for quotation).  Gomez states that "Armijo cooperated with the Government and gained significant benefit."  Objections at 3.  In the Addendum, the USPO explains that this assertion is based on a series of "FBI summary reports of two interviews with M.J.A. (on February 24, 2017 and January 19, 2019) and his trial testimony."  Addendum at 2.  Similarly, the United States contends that Gomez told M.A. that Baca wanted J.M. to be killed, because "the trial testimony established that [Gomez] informed [M.A.] that Baca wanted [J.M.] killed.  Response at 2.  The Court concludes, by a preponderance of the evidence, therefore, that Gomez told M.A. that Baca wanted J.M. killed.

not able to escape or fight off his attackers.  See PSR ¶ 30, at 11.

51.    Gomez did not personally order the killing of J.M.[11]  See Objections at 3-4; Reply at 3-6.

52.    Gomez did not order M.A,'s murder.[12]  See Objections at 4.

53.    On Baca's behalf, Gomez asked Robert Barragan to kill M.A. and provided a shank to Barragan.  See PSR ¶ 32, at 11; Response at 3-4.

54.    Barragan did not kill M.A.  See PSR ¶ 32, at 11.

55.    Sometime after 2012, Gomez, along with other SNM members, signed a birthday card to Baca, and wrote: "Pup, Mi Querido Mano,[13] its a simple wish that you have a great birthday.  You are gone but never forgotten.  We hope to see you soon. Happy Bday.  -Siempre con Todo Mi Amor, BG."[14]  PSR ¶ 33, at 11.

---

[11]The PSR states that Gomez "ordered the murder of" J.M.  PSR ¶ 30, at 11.  In the Addendum, the USPO explains that this assertion is based on a series of "FBI summary reports of two interviews with M.J.A. (on February 24, 2017 and January 19, 2019) and his trial testimony." Addendum at 2.  The evidence in the Addendum, however, does not establish that Gomez did anything more than relay the order to kill J.M. from Baca.  See Addendum at 2.  Similarly, the United States contends that Gomez ordered J.M. to be killed, because "the trial testimony established that [Gomez] informed [M.A.] that Baca wanted [J.M.] killed.  Response at 2.  The Court concludes, by a preponderance of the evidence, that Gomez did not order J.M. to be killed, because there is insufficient evidence to establish that Gomez did anything more than relay the message from Baca.

[12]The PSR states that Gomez "put a 'hit' out on M.A."  PSR ¶ 31, at 11 (no citation for quotation).  Gomez objects to this assertion.  See Objections at 4.  In the Addendum, the USPO states that, while Gomez was housed next to Baca, Gomez was "Baca's go to guy when things needed to be done," and that Gomez "gave Barragan a shank through the space under the door and told him to hit" M.A.  Addendum at 2.  Similarly, in the Response, the United States that "Baca put a hit on" M.A.  Response at 3.  There is insufficient evidence, therefore, for the Court to conclude that Gomez ordered M.A. to be killed.

[13]"Mi Querido Mano" translates literally to "My Dear Hand," but "Mano" is likely short for "hermano," which means "man."

[14]"Siempre con Todo, Mi Amor" translates to "always with everything, my love."

56.     The birthday card was "sent to show solidarity among the gang and respect for Baca." PSR ¶ 33, at 11

57.     On October 23, 2013, after visitation, corrections officers searched Gomez and, after a physical altercation with a corrections officer to prevent the officer from recovering the package that Gomez dropped, found "an unspecified amount of suboxone and brown heroin." PSR ¶ 35, at 12.

58.     For his attack on the corrections officer and failed attempt at hiding the drugs, Gomez was charged with Assault/Battery on Staff, tampering with evidence, and refusal to be restrained.  See PSR ¶ 35, at 12.

59.     Sometime between 2012 and 2014, Gomez "posed in a group photo with other members of the SNM to show solidarity as a gang"; the photograph was taken on the bleachers at Southern New Mexico Correctional Facility.  PSR ¶ 36, at 12.

60.     Between 2013 and 2014, Gomez ordered Benjamin Clark to kill his brother, Vernon Clark, with the hope that B. Clark could be punished for refusing to do so, because Gomez believed B. Clark was cooperating with STIU.[15]  See PSR ¶ 37, at 12.

---

[15]Gomez objects to this fact, because "this information stems from an unnamed source." Objections at 4.  In the Reply, Gomez -- acting on new information -- argues that the source of this information, B. Clark, "had never made this allegation against Mr. Gomez until just before Mr. Gomez' arrest."  Reply at 10.  According to Gomez, "Benjamin Clark was no longer an SNM member and could not have been ordered by SNM, much less Mr. Gomez, to kill his brother Vernon."  Reply at 10.  In the Response, the United States contends that Gomez tried to have B. Clark kill V. Clark, and cites to an FBI Report detailing an interview B. Clark gave to Special Agent Lorraine Hardy on August 29, 2019, at the United States Courthouse in Las Cruces, New Mexico.  See Response at 5 (citing FBI Report of Benjamin Clark Interview, filed May 6, 2021 (Doc. 103-8)("B. Clark Interview").  In the Clark Interview, B. Clark told Hardy that in 2013 or 2014, "Gomez tried to have Clark kill Vernon Clark so Clark would be punished for saying no." Clark Interview at 2.  Gomez argues that this evidence is insufficient to establish that Gomez ordered B. Clark to kill V. Clark, because B. Clark did not accuse Gomez in other interviews, and because Baca put out a separate hit on V. Clark.  See Reply at 10.  Because neither B. Clark's

61.     Gomez had "'earned his Bones'[16] by 'slicing individuals with a razor blade in Hobbs," New Mexico, but was "assaulted after the Hobbs incident."  PSR ¶ 38, at 12.

62.     Sometime after 2014, M.R., a.k.a. "Blue," and F.G., a.k.a. "Frankie G," sent "legal paperwork regarding P.S. from the North Facility in Santa Fe to Gomez at the Southern New Mexico Correctional Facility in Las Cruces," New Mexico, which indicates that "P.S. had cooperated with law enforcement."  PSR ¶ 39, at 12.

63.     The paperwork that M.R. and F.G. sent to Gomez said that P.S. had cooperated with law enforcement.  See PSR ¶ 39, at 12.

64.     Gomez transferred the paperwork to E.M., so that a hit could be put on P.S.  See PSR ¶ 39, at 12.

65.     On March 7, 2014, Gomez send a message to Rudy Perez to reassure Perez that, despite rumors to the contrary, Gomez did not think he had snitched against SNM regarding J.M.'s murder.[17]  See PSR ¶ 42, at 13.

---

earlier failures to state that Gomez tried to have him killed, nor the existence of a separate hit on V. Clark by Baca, creates reason to doubt Clark's statements, the Court concludes, by a preponderance of the evidence, that Gomez ordered B. Clark to kill his brother, V. Clark.

[16]Earning one's bones is "an SNM term of art that refers to murdering or assaulting somebody to gain esteem, rank, or membership within the SNM."  United States v. DeLeon, No. CR 15-4268 JB, 2020 WL 19269, at *36 (D.N.M. 2020)(Browning, J.).

[17]Gomez disputes this fact, because "[n]o written message has been provided to the defense" and "Gomez denies having any conversation of that kind with Perez."  Objections at 4-5.  In the Response, the United States counters, however, that "the record supports the contention that [Gomez] spoke with Rudy Perez regarding the Javier Molina [J.M.] murder and reassured Perez that he was not considered a snitch."  Reply at 5.  The USPO notes that, at the Gomez' change-of-plea hearing on September 25, 2020, Gomez noted that he "wrote letters between SNM gang members promoting actions against other SNM gang members that might cause them harm.  I passed legal paperwork that could have resulted in harm to other SNM gang members . . . ."  Addendum at 4 (no citation for quotation).  In the Reply, Gomez does not address this position.  See Reply at 1-13.  The Court concludes, therefore, that Gomez wrote a message to Rudy Perez to reassure Perez that Gomez did not believe Perez had snitched against SNM.

66.     Sometime before 2015, Baca and Gomez established a "secret code to use when writing/talking to each other to conceal gang business from law enforcement detection." PSR ¶ 43, at 13.

67.     In March, 2015, Gomez wrote a letter discussing SNM business to Baca and sent that letter through Gomez' wife, Joyce Gomez.  See PSR ¶ 44, at 13.

68.     In 2015, Gomez and fellow SNM member Lupe Urquizo, acting on an order that had been standing within SNM for over ten years, instructed SNM member Conrad Villegas to assault J.R.  See PSR ¶ 47, at 13.[18]

69.     In April 2015, Baca sent Gomez a coded letter from Arizona that instructed Gomez

---

[18]Gomez objects to this fact, because "the only evidence that supports Gomez being in the loop comes from Urquizo himself," and "Villegas has never said that Gomez played a role in his attack on" J.R.  Objections at 5.  Gomez further states that "Uqruizo . . . was another Government cooperator who received a substantial benefit for information he provided and testimony he gave," so his information "remains unreliable." Objections at 5.  In the Response, the United States argues that "Urquizo reported that he and [Gomez] tasked Conrad Villegas with assaulting" J.R. based on a Baca order.  Response at 5.  The United States notes that an attached FBI report states that "Urquizo and Jonathan Gomez . . . tasked Conrad Villegas with assaulting [J.R.], after the lockdown was lifted in 2015." FBI Report regarding the Hit on J.R. at 1, filed May 6, 2021 (Doc. 103-10)("J.R. Report").  See Response at 5.  In addition, the United States explains that, in later trial testimony, Urquizo clarified that "Baca wanted [J.R.] murdered but that [Gomez] changed the order so that [J.R.] would only be assaulted."  Response at 5-6.  In the Reply, Gomez argues that the information Urquizo supplied is not reliable, because other SNM members were involved in the attack on J.R.  See Reply at 11-12.  For example, Gomez states that Carlos Herrera and Alex Munoz were the "leaders who authorized the hit on [J.R.] and that his was order was passed to Mr. Villegas." Reply at 12.  In addition, Gomez argues that Urquizo "could not have seen Mr. Gomez order Mr. Villegas to assault [J.R.] on July 13, 2015," because Urquizo "had been transferred from the Southern facility to the Penitentiary of New Mexico a month earlier." Reply at 12.  Gomez does not offer reason to doubt, however, that Gomez could have relayed the information to Villegas before Urquizo left.  Although law enforcement reports are not inherently reliable, see United States v. Padilla, 793 F. App'x 749, 757 (10th Cir. 2019), Gomez does not offer any reason to doubt the J.R. Report contents other than the assertion that the information is unreliable, because Urquizo "was another Government cooperator."  Objections at 5.  Gomez' arguments do not, therefore, persuade the Court.

to have J.R. "beat up, but not stabbed."  PSR ¶ 47, at 13.[19]

70.    The April, 2015, letter also ordered "BB" to be "hit," because "'BB' had paperwork on J.M. and did not act on it." [20]  PSR ¶ 47, at 13 (no citation for quotation).

---

[19]Gomez objects to this fact, because "the only evidence that supports Gomez being in the loop comes from Urquizo himself," and "Villegas has never said that Gomez played a role in his attack on" J.R.  Objections at 5.  Gomez further states that "Uqruizo . . . was another Government cooperator who received a substantial benefit for information he provided and testimony he gave," so his information "remains unreliable."  Objections at 5.  In the Response, the United States argues that "Urquizo reported that he and [Gomez] tasked Conrad Villegas with assaulting" J.R. based on a Baca order.  Response at 5.  The United States notes that an attached FBI report states that "Urquizo and Jonathan Gomez . . . tasked Conrad Villegas with assaulting [J.R.], after the lockdown was lifted in 2015."  J.R. Report at 1.  See Response at 5.  In addition, the United States explains that, in later trial testimony, Urquizo clarified that "Baca wanted [J.R.] murdered but that [Gomez] changed the order so that [J.R.] would only be assaulted."  Response at 5-6.  In the Reply, Gomez argues that the information Urquizo supplied is not reliable, because other SNM members were involved in the attack on J.R.  See Reply at 11-12.  For example, Gomez states that Carlos Herrera and Alex Munoz were the "leaders who authorized the hit on [J.R.] and that his was order was passed to Mr. Villegas."  Reply at 12.  In addition, Gomez argues that Urquizo "could not have seen Mr. Gomez order Mr. Villegas to assault [J.R.] on July 13, 2015," because Urquizo "had been transferred from the Southern facility to the Penitentiary of New Mexico a month earlier."  Reply at 12.  Gomez does not offer reason to doubt, however, that Gomez could have relayed the information to Villegas before Urquizo left.  Although law enforcement reports are not inherently reliable, see United States v. Padilla, 793 F. App'x at 757, Gomez does not offer any reason to doubt the J.R. Report contents J.R. Report contents other than the assertion that the information is unreliable, because Urquizo "was another Government cooperator."  Objections at 5.  Gomez' arguments do not, therefore, persuade the Court.

[20]Gomez objects to this fact, because "the only evidence that supports Gomez being in the loop comes from Urquizo himself," and "Villegas has never said that Gomez played a role in his attack on" J.R.  Objections at 5.  Gomez further states that "Uqruizo . . . was another Government cooperator who received a substantial benefit for information he provided and testimony he gave," so his information "remains unreliable."  Objections at 5.  In the Response, the United States argues that "Urquizo reported that he and [Gomez] tasked Conrad Villegas with assaulting" J.R.  Response at 5.  The United States notes that an attached FBI report states that "Urquizo and Jonathan Gomez . . . tasked Conrad Villegas with assaulting [J.R.], after the lockdown was lifted in 2015."  J.R. Report at 1.  See Response at 5.  In addition, the United States explains that, in later trial testimony, Urquizo clarified that "Baca wanted [J.R.] murdered but that [Gomez] changed the order so that [J.R.] would only be assaulted."  Response at 5-6.  In the Reply, Gomez argues that the information Urquizo supplied is not reliable, because other SNM members were involved in the attack on J.R.  See Reply at 11-12.  For example, Gomez states that Carlos Herrera and Alex Munoz were the "leaders who authorized the hit on [J.R.] and that his was order was passed to Mr. Villegas."  Reply at 12.  In addition, Gomez argues that Urquizo "could not

71.     In July 2015, Gomez and fellow SNM member Urquizo "discussed" the fact that Baca had "send word via Gomez to hit inmate J.R. once a lockdown was lifted."  PSR ¶ 48, at 14.[21]

72.     In approximately October, 2015, Baca "returned from a facility in Colorado and confirmed what Gomez had reported about wanting J.R. to be assaulted but not stabbed; Baca also confirmed the hit on 'B.B.'"[22]  PSR ¶ 48, at 14.

---

have seen Mr. Gomez order Mr. Villegas to assault [J.R.] on July 13, 2015," because Urquizo "had been transferred from the Southern facility to the Penitentiary of New Mexico a month earlier." Reply at 12.  Gomez does not offer reason to doubt, however, that Gomez could have relayed the information to Villegas before Urquizo left.  Although law enforcement reports are not inherently reliable, see United States v. Padilla, 793 F. App'x at 757, Gomez does not offer any reason to doubt the J.R. Report contents other than the assertion that the information is unreliable, because Urquizo "was another Government cooperator."  Objections at 5.  Gomez' arguments do not, therefore, persuade the Court.

[21]Gomez objects to this fact, because "the only evidence that supports Gomez being in the loop comes from Urquizo himself," and "Villegas has never said that Gomez played a role in his attack on" J.R.  Objections at 5.  Gomez further states that "Uqruizo . . . was another Government cooperator who received a substantial benefit for information he provided and testimony he gave," so his information "remains unreliable."  Objections at 5.  In the Response, the United States argues that "Urquizo reported that he and [Gomez] tasked Conrad Villegas with assaulting" J.R. based on a Baca order.  Response at 5.  The United States notes that an attached FBI report states that "Urquizo and Jonathan Gomez . . . tasked Conrad Villegas with assaulting [J.R.], after the lockdown was lifted in 2015."  J.R. Report at 1.  See Response at 5.  In addition, the United States explains that, in later trial testimony, Urquizo clarified that "Baca wanted [J.R.] murdered but that [Gomez] changed the order so that [J.R.] would only be assaulted."  Response at 5-6.  Although law enforcement reports are not inherently reliable, see United States v. Padilla, 793 F. App'x at 757, Gomez does not offer any reason to doubt the J.R. Report contents other than the assertion that the information is unreliable, because Urquizo "was another Government cooperator." Objections at 5.  Gomez' arguments do not, therefore, persuade the Court.

[22]Gomez objects to this fact, because "the only evidence that supports Gomez being in the loop comes from Urquizo himself," and "Villegas has never said that Gomez played a role in his attack on" J.R.  Objections at 5.  Gomez further states that "Uqruizo . . . was another Government cooperator who received a substantial benefit for information he provided and testimony he gave," so his information "remains unreliable."  Objections at 5.  In the Response, the United States argues that "Urquizo reported that he and [Gomez] tasked Conrad Villegas with assaulting" J.R. based on a Baca order.  Response at 5.  The United States notes that an attached FBI report states that "Urquizo and Jonathan Gomez . . . tasked Conrad Villegas with assaulting [J.R.], after the

73.     On July 13, 2015, there was a fight in one of the pods at Southern NM.  See PSR ¶ 49, at 14.

74.     The July, 13, 2015, fight started with Villegas approaching J.R. from behind, and "str[iking] J.R. about the head and face with his right fist," which "caused J.R. to fall to the ground."  PSR ¶ 50, at 14.

75.     Villegas continued to strike J.R.'s face and head with his "fists, knees, and feet."  PSR ¶ 50, at 14.

76.     Villegas' assault on J.R. lasted "approximately two minutes."  PSR ¶ 50, at 14.

77.     The July, 13, 2015, fight resulted in J.R. standing by the door to the pod "covered in blood."  PSR ¶ 49, at 14.

78.     After J.R. was discovered, corrections officers "removed J.R. and locked down the other inmates in an effort to locate the other inmate involved in the altercation."  PSR ¶ 49, at 14.

79.     Corrections officers found SNM member Conrad Villegas, "who was washing off his body in a sink," because Villegas had blood on his thighs and boxer shorts.  PSR ¶ 49, at 14.

80.     Villegas had "red and swollen knuckles."  PSR ¶ 49, at 14.

---

lockdown was lifted in 2015." J.R. Report at 1.  See Response at 5.  In addition, the United States explains that, in later trial testimony, Urquizo clarified that "Baca wanted [J.R.] murdered but that [Gomez] changed the order so that [J.R.] would only be assaulted." Response at 5-6.  In the Reply, Gomez argues that the information Urquizo supplied is not reliable, because other SNM members were involved in the attack on J.R.  See Reply at 11-12.  For example, Gomez states that Carlos Herrera and Alex Munoz were the "leaders who authorized the hit on [J.R.] and that his was order was passed to Mr. Villegas."  Reply at 12.  In addition, Gomez argues that Urquizo "could not have seen Mr. Gomez order Mr. Villegas to assault [J.R.] on July 13, 2015," because Urquizo "had been transferred from the Southern facility to the Penitentiary of New Mexico a month earlier." Reply at 12.  Gomez does not offer reason to doubt, however, that Gomez could have relayed the information to Villegas before Urquizo left.  Although law enforcement reports are not inherently reliable, see United States v. Padilla, 793 F. App'x at 757, Gomez does not offer any reason to doubt the J.R. Report contents other than the assertion that the information is unreliable, because Urquizo "was another Government cooperator."  Objections at 5.  Gomez' arguments do not, therefore, persuade the Court.

81.     There is surveillance video of the fight between J.R. and Villegas.  See PSR ¶ 50, at 14.

82.     J.R. was transported to Memorial Medical Center in Las Cruces for treatment for his injuries, including four lacerations on his head and face, eyes swollen shut, a "large knot on his right elbow," and a "depression to the right side of his skull."  PSR ¶ 50, at 14.

83.     Memorial Medical Center closed J.R.'s wounds with sutures, and prescribed him artificial tears and pain management medication.  See PSR ¶ 50, at 14.

84.     After the attack on J.R., Urquizo called Archuleta to tell him that J.R. "had been 'hit.'"  PSR ¶ 50, at 14 (no citation for quotation).

85.     On December 7, 2015, the NMCD "conducted a state-wide shake down of all active SNM members," and found six "kites," or letters, in Gomez' cell that discussed SNM gang business.  PSR ¶ 52, at 14.

86.     Although Gomez tore up the "kites," or letters, and threw them in the trash can, NMCD officials were able to piece them together.  See PSR ¶ 52, at 14.

87.     Someone using the name "Grizzly" authored two of the letters; Someone using the name "Jokes" authored two of the letters; Someone using the name "D-Oz" authored one of the letters; the last letter is unsigned, but referenced someone named "Joker," who is known to be SNM member Frankie Herrera.  PSR ¶ 53, at 14.

88.     The letters in Gomez' cell "discuss the individuals initially charged with the SNM RICO conspiracy; SNM member 'Creeper' and his loyalty; sending money through Gomez' girlfriend; and discussing needles and paraphernalia, among other things."  PSR ¶ 53, at 14 (no citation for quotation).

89.     Gomez has now "disassociated himself from SNM and its activities."  Objections

at 9.

90.     On August 22, 2016, Gomez had a notebook in his prison cell that contained SNM

members' names and addresses; the notebook was found during a search NMCD conducted of all

the SNM prison cells at the PNM.  See PSR ¶ 54, at 14.

91.     On November 10, 2020, at approximately 8:00 a.m., during a search of Gomez' cell

at the Cibola County Correctional Center, corrections officer Chavez found an eight-inch

sharpened metal instrument "hidden in a crack in the wall behind tissue."  PSR ¶ 42, at 13.

92.     The metal instrument was confiscated.  See PSR ¶ 42, at 13.

93.     At the DeLeon, Baca, and Martinez trials, the Court found the cooperating

witnesses to be generally credible, unless, through cross-examination or otherwise, the evidence

overwhelmingly showed that a cooperating witness' assertion was not credible.

## LAW REGARDING RELEVANT CONDUCT FOR SENTENCING

In calculating an appropriate sentence, the Guidelines consider a defendant's "offense of

conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning

is specified or is otherwise clear from the context." U.S.S.G. § 1B1.1, n.1(H).  In United States v.

Booker, the Supreme Court notes:

> Congress' basic statutory goal -- a system that diminishes sentencing
> disparity -- depends for its success upon judicial efforts to determine, and to base
> punishment upon, the real conduct that underlies the crime of conviction. That
> determination is particularly important in the federal system where crimes defined
> as, for example, "obstruct[ing], delay[ing], or affect[ing] commerce or the
> movement of any article or commodity in commerce, by . . . extortion," . . . can
> encompass a vast range of very different kinds of underlying conduct.

543 U.S. at 250-51 (emphasis in original)(quoting 18 U.S.C. § 1951(a)). The Supreme Court's

reasoning in United States v. Booker suggests that the consideration of real conduct is necessary

to effectuate Congress' purpose in enacting the Guidelines.

Section 1B1.3(a) provides that the base offense level under the Guidelines "shall be determined" based on the following:

(1)

    (A)    all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

    (B)    in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

(2)    solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3)    all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

(4)    any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a)(1)-(4). The court may consider, as relevant conduct, actions that have not resulted in a conviction. Pursuant to U.S.S.G. § 6A1.3's commentary, evidentiary standards lower than beyond a reasonable doubt are permitted to show relevant conduct. The court may rely upon reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence standard. See United States v. Vigil, 476 F. Supp. 2d 1231, 1245 (D.N.M. 2007)(Browning J.), aff'd, 523 F.3d 1258 (10th Cir. 2008). Accord United States v. Schmidt, 353 F. App'x. 132, 135 (10th Cir. 2009)(unpublished)("The district court's determination of 'relevant conduct' is a factual finding

subject to a preponderance of the evidence standard, and clear error review."). The evidence and information upon which the court relies, however, must have sufficient indicia of reliability. See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

Supreme Court precedent on relevant conduct consists primarily of two cases: Witte v. United States, 515 U.S. 389 (1995), and United States v. Watts, 519 U.S. 148 (1997). In Witte v. United States, the Supreme Court upheld the use of uncharged conduct at sentencing against a double-jeopardy challenge. See 515 U.S. at 404-06. The defendant in Witte v. United States had been involved in an unsuccessful attempt to import marijuana and cocaine into the United States in 1990, and in an attempt to import marijuana in 1991. See 515 U.S. at 392-93. In March 1991, a federal grand jury indicted the defendant for attempting to possess marijuana with intent to distribute in association with the defendant's latter attempt to import narcotics. See 515 U.S. at 392-93. At sentencing, the district court concluded that, because the 1990 attempt was part of the continuing conspiracy, it was relevant conduct under U.S.S.G. § 1B1.3, and thus calculated the defendant's base offense level based on the aggregate amount of drugs involved in both the 1990 and 1991 episodes. See 515 U.S. at 394.

In September, 1992, a second federal grand jury indicted the defendant for conspiring and attempting to import cocaine in association with his activities in 1990. See 515 U.S. at 392-93. The defendant moved to dismiss the indictment, contending that he had already been punished for the cocaine offenses, because the court had considered those offenses relevant conduct at the sentencing for the 1991 marijuana offense. See 515 U.S. at 395. The district court agreed and

dismissed the indictment, holding that punishment for the cocaine offenses would violate the prohibition against multiple punishments in the Double Jeopardy Clause of the Fifth Amendment to the Constitution.  See 515 U.S. at 395.  The United States Court of Appeals for the Fifth Circuit reversed and held that "the use of relevant conduct to increase the punishment of a charged offense does not punish the offender for the relevant conduct."  United States v. Witte, 25 F.3d 250, 258 (5th Cir. 1994).  In reaching this holding, the Fifth Circuit acknowledged that its conclusion was contrary to other United States Courts of Appeals opinions, including a Tenth Circuit opinion, that had previously considered this question.  See 25 F.3d at 255 n.19 (citing United States v. Koonce, 945 F.2d 1145 (10th Cir. 1991)).

The Supreme Court granted certiorari to resolve the conflict between the Courts of Appeals and affirmed the Fifth Circuit decision.  See 515 U.S. at 395.  In holding that a district court's consideration of the defendant's relevant conduct did not punish the defendant for that conduct, the Supreme Court concluded that "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted."  515 U.S. at 401.  The Supreme Court reasoned that sentencing courts had always considered relevant conduct and "the fact that the sentencing process has become more transparent under the Guidelines . . . does not mean that the defendant is now being punished for uncharged relevant conduct as though it were a distinct criminal offense."  515 U.S. at 402.  Sentencing enhancements do not punish a defendant for uncharged offenses; rather, they reflect Congress' policy judgment "that a particular offense should receive a more serious sentence within the authorized range if it was either accompanied by or preceded by additional criminal activity."  515 U.S. at 403.

In <u>United States v. Watts</u>, the Supreme Court, in a per curiam opinion, relied upon <u>Witte v. United States</u> and upheld, against a double-jeopardy challenge, a sentencing judge's use of conduct for which the defendant had been acquitted.  See <u>United States v. Watts</u>, 519 U.S. at 149.  The Supreme Court noted that its conclusion was in accord with every United States Court of Appeals -- other than the Court of Appeals for the Ninth Circuit -- and that each had previously held that a sentencing court may consider conduct for which the defendant had been acquitted, if the government establishes that conduct by a preponderance of the evidence.  See 519 U.S. at 149 (citing, <u>e.g.</u>, <u>United States v. Coleman</u>, 947 F.2d 1424, 1428-29 (10th Cir. 1991)).  The Supreme Court began its analysis with 18 U.S.C. § 3661: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." <u>United States v. Watts</u>, 519 U.S. at 151 (quoting 18 U.S.C. § 3661).  According to the Supreme Court, 18 U.S.C. § 3661 embodies the codification of "the longstanding principle that sentencing courts have broad discretion to consider various kinds of information" and that "the Guidelines did not alter this aspect of the sentencing court's discretion." <u>United States v. Watts</u>, 519 U.S. at 151-52.

Tenth Circuit caselaw adheres closely to the Supreme Court's results in <u>Witte v. United States</u> and <u>United States v. Watts</u>. See <u>United States v. Andrews</u>, 447 F.3d 806, 810 (10th Cir. 2006)(applying <u>Witte v. United States</u>' holding to affirm that a career-offender enhancement does not violate the Fifth Amendment's Double Jeopardy Clause).  In <u>United States v. Banda</u>, 168 F. App'x. 284 (10th Cir. 2006)(unpublished), the Tenth Circuit rejected a defendant's argument that it was "structural error" for a district court to find sentencing factors "by a preponderance of the evidence rather than the jury applying a beyond-a-reasonable-doubt standard." 168 F. App'x. at

290. The Tenth Circuit explained that "'[i]t is now universally accepted that judge-found facts by themselves do not violate the Sixth Amendment. Instead, the constitutional error was the court's reliance on judge-found facts to enhance the defendant's sentence mandatorily.'" 168 F. App'x. at 290 (quoting United States v. Lauder, 409 F.3d 1254, 1269 (10th Cir. 2005)).

In United States v. Coleman, the defendant appealed the district court's sentence enhancement for firearms possession after he was convicted of conspiracy to possess and possession of a controlled substance with intent to distribute but was acquitted of using or carrying a firearm during and in relation to a drug trafficking crime. See 947 F.2d at 1428. The Tenth Circuit acknowledged that courts had taken various positions on whether a sentence may be enhanced for firearms possession despite a defendant's acquittal on firearms charges. See 947 F.2d at 1428-29 (citing United States v. Duncan, 918 F.2d 647, 652 (6th Cir. 1990)("[A]n acquittal on a firearms carrying charge leaves ample room for a district court to find by the preponderance of the evidence that the weapon was possessed during the drug offense."); United States v. Rodriguez, 741 F. Supp. 12, 13-14 (D.D.C. 1990)(refusing to apply 2-level enhancement for firearms possession, because "[t]o add at least 27 months to the sentence for a charge of which the defendant was found not guilty violates the constitutional principle of due process and the ban against double jeopardy")).

Without discussion related to the standard of proof a sentencing court should use to make factual findings, the Tenth Circuit held that the district court did not err in enhancing the defendant's sentence for possession of a firearm. See United States v. Coleman, 947 F.2d at 1429. The Tenth Circuit based its conclusion on evidence that: (i) individuals at the arrest scene handled the weapons at will; (ii) the weapons were handled at will by individuals who lived at the house; and (iii) the weapons were kept for the protection of conspiracy participants and the narcotics

involved.  See 947 F.2d at 1429. The Tenth Circuit summarized that, in reviewing relevant federal case law, it found "persuasive the decisions that have allowed a sentencing court to consider trial evidence that was applicable to a charge upon which the defendant was acquitted."  947 F.2d at 1429.

In United States v. Washington, 11 F.3d at 1510, the defendant argued that the United States needed to prove drug quantities used as relevant conduct to establish a defendant's offense level by clear-and-convincing evidence, rather than by a preponderance of the evidence.  See 11 F.3d at 1512.  The defendant objected to his sentencing, because the drug quantity that the district court considered as relevant conduct, and which the court found by a preponderance of the evidence, increased his Guidelines sentencing range from 210-262 months to life in prison.  See 11 F.3d at 1515.  The defendant argued "that because the additional drug quantities effectively resulted in a life sentence a higher standard of proof should be required."  11 F.3d at 1515. Although the Tenth Circuit in United States v. Washington "recognize[d] the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof," it held that "the Due Process Clause does not require sentencing facts in the ordinary case to be proved by more than a preponderance standard." 11 F.3d at 1516 (citing McMillan v. Pennsylvania, 477 U.S. 79, 84 (1986)).  See United States v. Sangiovanni, 2014 WL 4347131, at *22-26 (concluding that a sentencing court can cross reference from the Guidelines that correspond to the defendant's crime of conviction to the Guidelines for another, more harshly punished crime, if it can be established by a preponderance of the evidence that the defendant committed the more serious crime); United States v. Cervantes-Chavez, 2014 WL 6065657, at *14-15 (D.N.M. 2014)(Browning, J.)(cross-referencing from the guideline for being an illegal

alien in possession of a firearm to the drug-possession guideline after finding by a preponderance of the evidence that the defendant committed a drug-possession crime).

The Court previously has held that it may consider a defendant's refusal to answer questions for the PSR, while not drawing an adverse inference from the refusal. See United States v. Goree, 2012 WL 592869, at *11 (D.N.M. 2012)(Browning, J.). The Court has also held that, although it can consider a defendant's silence about information regarding herself or others engaging in criminal conduct, it will not rely on that silence to increase the defendant's sentence. See United States v. Chapman, 2012 WL 257814, at *13 n.5 (D.N.M. 2012)(Browning, J.). Finally, the Court has held that a defendant's "aggression towards other individuals, and the murder he may have attempted to orchestrate while incarcerated" is relevant information which the Court can consider in fashioning a proper sentence. United States v. Romero, 2012 WL 6632493, at *23 (D.N.M. 2012)(Browning, J.). See United States v. Tapia, No. CR 12-3012 JB, 2017 WL 6417610, at *10–15 (D.N.M. Dec. 14, 2017).

## LAW REGARDING REDUCTIONS FOR ACCEPTANCE OF RESPONSIBILITY UNDER U.S.S.G. § 3E1.1

The defendant has the burden of proving by a preponderance of the evidence that he is entitled to a reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a). See United States v. Meyers, 95 F.3d 1475, 1486 (10th Cir. 1996); United States v. McMahon, 91 F.3d 1394, 1396-97 (10th Cir. 1996), cert. denied, 519 U.S. 1018 (1996). The Tenth Circuit reviews "a district court's determination not to grant a reduction for acceptance of responsibility for clear error." United States v. Ochoa-Olivas, 426 F. App'x 612, 613 (10th Cir. 2011)(unpublished)(citing United States v. Hutchinson, 573 F.3d 1011, 1032 (10th Cir. 2009)). In reviewing the district court's findings, the Tenth Circuit "remain[s] mindful that '[t]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the

sentencing judge is entitled to great deference on review.'" United States v. Ivy, 83 F.3d 1266,

1292-93 (10th Cir. 1996)(quoting U.S.S.G. § 3E1.1, Application Note 5), cert. denied, 519 U.S.

901 (1996).  U.S.S.G. § 3E1.1 provides:

> (a)    If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels.
>
> (b)    If the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, decrease the offense level by 1 additional level.

U.S.S.G. § 3E1.1.  The application notes to U.S.S.G. § 3E1.1(a) state in relevant part:

> **1.**    In determining whether a defendant qualifies under subsection (a), appropriate considerations include, but are not limited to, the following:
>
> > **(A)**    truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct).  Note that a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a).  A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection.  However, a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility;
> >
> > **(B)**    voluntary termination or withdrawal from criminal conduct or associations;
> >
> > **(C)**    voluntary payment of restitution prior to adjudication of guilt;
> >
> > **(D)**    voluntary surrender to authorities promptly after commission of the offense;
> >
> > **(E)**    voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense;

     **(F)**     voluntary resignation from the office or position held during the commission of the offense;

     **(G)**     post-offense rehabilitative efforts (e.g., counseling or drug treatment); and

     **(H)**     the timeliness of the defendant's conduct in manifesting the acceptance of responsibility.

**2.**     This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

**3.**     Entry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which he is accountable under § 1B1.3 (Relevant Conduct) (see Application Note 1(A) ), will constitute significant evidence of acceptance of responsibility for the purposes of subsection (a). However, this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility. A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right.

. . . .

**5.**     The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review.

**6.**     Subsection (a) provides a 2-level decrease in offense level. Subsection (b) provides an additional 1-level decrease in offense level for a defendant at offense level 16 or greater prior to the operation of subsection (a) who both qualifies for a decrease under subsection (a) and who has assisted authorities in the investigation or prosecution of his own misconduct by taking the steps set forth in subsection (b). The timeliness of the defendant's acceptance of

responsibility is a consideration under both subsections, and is context specific.  In general, the conduct qualifying for a decrease in offense level under subsection (b) will occur particularly early in the case.  For example, to qualify under subsection (b), the defendant must have notified authorities of his intention to enter a plea of guilty at a sufficiently early point in the process so that the government may avoid preparing for trial and the court may schedule its calendar efficiently.

Because the Government is in the best position to determine whether the defendant has assisted authorities in a manner that avoids preparing for trial, an adjustment under subsection (b) may only be granted upon a formal motion by the Government at the time of sentencing.  See section 401(g)(2)(B) of Pub. L. 108-21.

**Background:** The reduction of offense level provided by this section recognizes legitimate societal interests.  For several reasons, a defendant who clearly demonstrates acceptance of responsibility for his offense by taking, in a timely fashion, the actions listed above (or some equivalent action) is appropriately given a lower offense level than a defendant who has not demonstrated acceptance of responsibility.

Subsection (a) provides a 2-level decrease in offense level.  Subsection (b) provides an additional 1-level decrease for a defendant at offense level 16 or greater prior to operation of subsection (a) who both qualifies for a decrease under subsection (a) and has assisted authorities in the investigation or prosecution of his own misconduct by taking the steps specified in subsection (b).  Such a defendant has accepted responsibility in a way that ensures the certainty of his just punishment in a timely manner, thereby appropriately meriting an additional reduction. Subsection (b) does not apply, however, to a defendant whose offense level is level 15 or lower prior to application of subsection (a).  At offense level 15 or lower, the reduction in the guideline range provided by a 2-level decrease in offense level under subsection (a) (which is a greater proportional reduction in the guideline range than at higher offense levels due to the structure of the Sentencing Table) is adequate for the court to take into account the factors set forth in subsection (b) within the applicable guideline range.  Section 401(g) of Public Law 108-21 directly amended subsection (b), Application Note 6 (including adding the last paragraph of that application note), and the Background Commentary, effective April 30, 2003.

U.S.S.G. § 3E1.1 application notes & background (bold in the original).

The Tenth Circuit has held that it is proper for a sentencing court to deny a defendant any reduction for acceptance of responsibility solely on the basis of timeliness.  In United States v. Ochoa-Olivas, the Tenth Circuit addressed whether a defendant who pled guilty the morning his

trial was scheduled to commence was entitled to a 2-level reduction in his offense level under U.S.S.G. § 3E1.1(a).  On the day trial was to begin, "the district court assembled the jury venire, but they were dismissed when Ochoa-Olivas announced that he wanted to plead guilty.  After that announcement, the district court conducted a change-of-plea hearing, and Ochoa-Olivas pled guilty to the one count" of illegal reentry, in violation of 8 U.S.C. § 1326(a) and (b).  2011 WL 2160551, at *1.  The USPO released a PSR, which, pursuant to U.S.S.G. § 3E1.1(a), included a 2-level reduction for acceptance of responsibility.  The United States objected to the reduction, and "argued that it expended resources in preparing for trial and in providing travel and lodging for witnesses to attend the trial.  Therefore, it argued that [the defendant] should not be entitled to any reduction for acceptance of responsibility." 2011 WL 2160551, at *2.  The Honorable William P. Johnson, United States District Judge for the United States District Court for the District of New Mexico, agreed with the United States and denied the defendant a 2-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a), stating that "a two-level reduction for acceptance of responsibility is not appropriate because the Defendant waited until the morning of trial to plead guilty."  2011 WL 2160551, at *2.

The defendant appealed, "contend[ing] that the district court clearly erred because it should have granted a two-level downward adjustment as he met the criteria for acceptance of responsibility" under U.S.S.G. § 3E1.1(a), and the United States "counter[ed] that the 'timing of the decision to plead guilty is important precisely because the adjustment was meant to expedite resolution of cases, and thereby to prevent prosecutive and judicial resources from being expended needlessly.'" 2011 WL 2160551, at *2 (citation to the record omitted).  The Tenth Circuit affirmed the district court, stating:

> The Sentencing Guidelines explicitly allow the district court to consider the timeliness of a defendant's guilty plea. U.S.S.G. § 3E1 .1 cmt. n.1(h).  We caution

that a late decision to plead guilty does not necessarily disqualify a defendant from receiving a downward adjustment for acceptance of responsibility. But a defendant who pleads guilty does not necessarily qualify for a downward adjustment for acceptance of responsibility either. See id. § 3E1.1 cmt. n. 3. It is up to the district court to determine whether a defendant qualifies for this downward adjustment using the appropriate considerations. In this case, the district court did just that, and therefore we cannot say that the district court committed clear error.

2011 WL 2160551, at *2.

Similarly, in United States v. Gonzalez Gomez, 85 F. App'x 94 (10th Cir. 2003)(unpublished), the Tenth Circuit affirmed a district court's refusal to decrease the offense level of a defendant who, "[o]n August 16, 2002, the same day of [his] trial, he very reluctantly pled guilty" and "informed the assigned probation officer of his intent to return to the United States despite agreeing not to." 85 F. App'x at 95. The Tenth Circuit affirmed the district court, holding that the defendant's "reluctant plea on the day of trial, coupled with his declared intent to continue to violate the law as he had done previously, undermines his argument that he accepts responsibility for his criminal conduct." 85 F. App'x at 95-96.

Other United States Courts of Appeals have held uniformly that a district court may refuse a defendant a 2-level reduction pursuant to U.S.S.G. § 3E1.1(a) for an eleventh-hour acceptance of responsibility. See, e.g., United States v. Diaz-Gaudarama, 614 F.3d 387, 390-91 (7th Cir. 2010)(denying 2-level reduction for defendant who first attempted to enter a guilty plea the day trial was to commence, before jury selection); United States v. Montero, 336 F. App'x 941, 942 (6th Cir. 2009)(holding that a defendant who pled guilty to conspiracy to induce aliens to enter the United States was not eligible for two-point reduction for acceptance of responsibility, because the defendant "did not offer his plea until the morning his trial was to begin, thus necessitating significant trial preparation by the government and the transportation of witnesses from across the state, and inconveniencing the jury pool which was already assigned to the trial," and stating that

"[t]he district court's reliance on the timing of [the defendant's] plea and the context in which it was offered is in full accord with § 3E1.1(a), the explanatory comments accompanying that section, and the cases interpreting and applying it"); United States v. Fischer, 551 F.3d 751, 755 (8th Cir. 2008)("[A] district court in denying an acceptance of responsibility reduction [pursuant to U.S.S.G. § 3E1.1(a)] may consider that the guilty plea was 'of the last hour variety, offered on the eve of trial.'")(quoting United States v. Erhart, 415 F.3d 965, 971 (8th Cir. 2005)); United States v. Rosalez-Cortez, 19 F.3d 1210, 1219 (7th Cir. 1993)("A judge may determine that a defendant has failed to accept responsibility by finding that he failed to demonstrate truthfulness and remorse prior to 'the final hour.'")(citations omitted).  In United States v. Diaz-Gaudarama, 614 F.3d 387 (7th Cir. 2010), the United States Court of Appeals for the Seventh Circuit affirmed a district court's sua sponte refusal to grant a defendant a 2-level offense level reduction under U.S.S.G. § 3E1.1(a).  See United States v. Diaz-Gaudarama, 614 F.3d at 390-91.  The defendant, David Diaz-Gaudarama, appealed the sentence he received after pleading guilty to conspiring to distribute methamphetamine, cocaine, and marijuana.  See United States v. Diaz-Gaudarama, 614 F.3d at 388.  After about a year of delay because of disputes over the Diaz-Gaudarama's competency, in which the district court ultimately concluded that Diaz-Gaudarama was malingering, Diaz-Gaudarama went to trial.  See United States v. Diaz-Gaudarama, 614 F.3d at 388.  On the day trial was scheduled to commence, Diaz-Gaudarama attempted to enter a guilty plea, which the district court refused, because he stated that he sought to plead guilty to receive medical care.  See United States v. Diaz-Gaudarama, 614 F.3d at 388.  After the government rested its case, Diaz-Gaudarama again expressed a desire to plead guilty, this time stating that he was aware of what he had done, and the district court accepted the plea:

> Diaz-Gaudarama's jury trial was scheduled to begin on June 8, 2009.  That day, before jury selection began, Diaz-Gaudarama attempted to plead guilty to the

charge contained in the indictment.   During the change of plea hearing, Diaz-Gaudarama admitted several details about the offense.   At the end of the hearing, however, the district court asked Diaz-Gaudarama what medicines he had been taking in the past few days.   Diaz-Gaudarama responded that he was taking a small white pill and he thought it was harming him.   He said he did not know what the pill was supposed to do, but that he was having difficulty swallowing it because something was wrong with his throat.   When the district court informed Diaz-Gaudarama that he would receive a sentence of at least ten years in prison, and up to life, Diaz-Gaudarama responded, "just as long as I get sent to the doctor, you can give me ten years.   You can give me life.   Just make sure I get to the doctor."   In light of these statements, the district court refused to accept the guilty plea.

The government completed its case on the third day of trial.   During an ensuing discussion with the district court concerning his right to testify in his own defense, Diaz-Gaudarama announced again that he wished to plead guilty.   This time, Diaz-Gaudarama informed the district court that he wished to plead guilty because he was, in fact, guilty as charged.   When asked again why he wished to plead guilty, Diaz-Gaudarama stated, "because I don't want to get too much time, and I am also aware of what I have done as well."   After a plea colloquy, the district court accepted Diaz-Gaudarama's guilty plea, and the jury was excused.

United States v. Diaz-Gaudarama, 614 F.3d at 389.  The USPO prepared a PSR which included a

2-level reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a), to which

neither the United States nor the defendant objected.  See United States v. Diaz-Gaudarama, 614

F.3d at 389-90.   "Sua sponte, the district court raised the question of whether Diaz-Gaudarama

was entitled to an acceptance-of-responsibility credit."  614 F.3d at 390.  After hearing argument

from both sides, "the district court declined to allow a reduction for acceptance of responsibility"

and "noted that it was not until the eve of trial that Diaz-Gaudarama attempted to plead guilty, and

that he did not in fact do so until after the government had presented its case against him."  614

F.3d at 390.

Diaz-Gaudarama appealed his sentence, and the Seventh Circuit affirmed.  See United

States v. Diaz-Gaudarama, 614 F.3d at 390-91.  The Seventh Circuit stated:

Under the advisory guidelines, a defendant may receive a two-level decrease in his offense level if he "clearly demonstrates acceptance of responsibility

for his offense." U.S.S.G. § 3E1.1(a).  A district court's decision to award or deny a defendant a reduction for acceptance of responsibility depends heavily on the facts, and is thus reviewed for clear error.  See United States v. McIntosh, 198 F.3d 995, 999 (7th Cir. 2000).

Diaz-Gaudarama argues that his initial plea colloquy on June 8, 2009 [before jury selection], is the sort of full and accurate account of his misconduct contemplated by application note 1(a) to U.S.S.G. § 3E1.1, which identifies as an appropriate consideration "truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct . . . ."  He wants us to focus on his first attempt to plead guilty, because entering a plea of guilty prior to trial and admitting the conduct comprising the offense of conviction is "significant evidence of acceptance of responsibility."  See U.S.S.G. § 3E1.1 n.3.  Of course, the district court did not actually accept Diaz-Gaudarama's plea until after the government had put on its case.  And in any event, a guilty plea before trial "may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility."  Id.

We have long held that the last-minute nature of a guilty plea provides a significant basis to deny an acceptance-of-responsibility reduction.  See, e.g., United States v. Carrera, 259 F.3d 818, 827 (7th Cir. 2001)(affirming denial of an acceptance-of-responsibility reduction [pursuant to U.S.S.G. § 3E1.1(a)] for a defendant who attempted to plead guilty on the first day of trial); United States v. Sierra, 188 F.3d 798, 804-05 (7th Cir. 1999)(affirming denial of an acceptance-of-responsibility reduction [pursuant to U.S.S.G. § 3E1.1(a)] for defendant who pleaded guilty on the last business day before trial); United States v. Rosalez-Cortez, 19 F.3d 1210, 1219 (7th Cir. 1993)(affirming denial of an acceptance-of-responsibility reduction [pursuant to U.S.S.G. § 3E1.1(a)] for a defendant who pleaded guilty after a two-day bench trial).  Even when a defendant pleads guilty in a timely manner, statements or conduct inconsistent with acceptance of responsibility may prevent a defendant from receiving a reduction. Rather than formulating categorical tests, we ask that district courts "assess the defendant's demonstration of 'genuine remorse,' or 'conscience.'"  McIntosh, 198 F.3d at 999-1000 (quoting United States v. Dvorak, 41 F.3d 1215, 1217 (7th Cir. 1994)).

The district court's decision in this case was not clear error.  First, the district court properly relied on the last-minute nature of the plea, as the earliest attempt Diaz-Gaudarama made to plead guilty occurred on the morning of trial. See Sierra, 188 F.3d at 804-05.  Second, Diaz-Gaudarama's own statements during his plea colloquy do not reflect remorse, but rather suggest that he pleaded guilty in an attempt to reduce his punishment; he said only that he didn't want to "get too much time" and that he was "aware of what he had done."  Finally, the district court found that Diaz-Gaudarama had faked psychological illness in an attempt to evade punishment. . . . Given Diaz-Gaudarama's attempt to avoid criminal responsibility for his actions, the absence of statements by Diaz-Gaudarama reflecting remorse

for his crime, and the last-minute nature of his attempt to plead guilty, he is not entitled to a reduction in his advisory guideline range for acceptance of responsibility.

614 F.3d at 390-91.

The Tenth Circuit has affirmed district court concluding that a defendant has not "voluntary[ily] terminat[ed] or withdraw[n] from criminal conduct or associations," U.S.S.G. § 3E1.1(a), application note 1(B), when the defendant attempts to distribute narcotics to another inmate during pretrial confinement or assaulting another prisoner, see United States v. Finnesy, 953 F.3d 675, 702 (10th Cir. 2020)(affirming a district court's conclusion that the defendant had not accepted responsibility for a guilty plea to escaping from custody where the defendant had "initiated the physical conduct" with another inmate that constituted "a battery" and "trafficking contraband"); United States v. Prince, 204 F.3d 1021, 1023-24 (10th Cir. 2000)(affirming a district court's denial of an adjustment for acceptance of responsibility for bank robbery based on reports of defendant's criminal conduct in prison -- stabbing another prisoner -- while awaiting sentencing).

## ANALYSIS

The Court will sustain in part and overrule in part the Objections, because, with respect to the seven factual Objections, a sentencing court can rely on information, including hearsay evidence, as long as it bears a "minimal indicia of reliability," United States v. Ruby, 706 F.3d 1221, 1227 (10th Cir. 2013), and, with respect to the legal Objection, Gomez "clearly demonstrates acceptance of responsibility for his offense," U.S.S.G. § 3E1.1, and the possession of the eight-inch sharpened metal instrument does not show that he does not accept responsibility. More specifically, the Court concludes that: (i) Gomez told M.A. that Baca ordered J.M. to be killed; (ii) Gomez did not put a hit on M.A. before July, 2012; (iii) Gomez ordered B. Clark to murder V.

- 35 -

Clark; (iv) sometime after March, 2014, Gomez sent a letter to Perez reassuring him that Gomez did not think Perez snitched against the SNM gang about J.M.'s murder; (v) on Baca's behalf, Gomez ordered Conrad Villegas to assault J.R.; (vi) Gomez was an influential member of the SNM gang; (vii) Gomez was Baca's right-hand man; and (viii) Gomez has accepted responsibility, so he is entitled to U.S.S.G. § 3E1.1's 2-level sentencing reduction.  A sentencing court can apply U.S.S.G. § 3E1.1's 2-level reduction when a defendant "clearly demonstrates acceptance of responsibility for his offense."  U.S.S.G. § 3E1.1.  The U.S.S.G. § 3E1.1 reduction is "simply a reward for those who take full responsibility."  United States v. Portillo-Valenzuela, 20 F.3d 393, 395 (10th Cir. 1994).

First, the Court sustains Objections (i) and (ii), because the evidence supports only the contention that Gomez relayed orders from Baca, and not that Gomez ordered hits on J.M. and M.A.  See PSR ¶¶ 29-32, at 10-11.  In the PSR, the USPO states that Gomez "ordered the murder of" J.M.[23] and "put a 'hit' out on M.A."  PSR ¶¶ 30-31, at 11 (no citation for quotation).  Gomez objects to both statements, because the USPO's information is "not reliable."  Objections at 4.  In the Response, the United States argues that Gomez ordered a J.M. hit, because Gomez "informed [M.A.] that Baca wanted [J.M.] killed."  Response at 2.  The United States also contends that Gomez ordered a hit on M.A., because "Baca put a hit on" M.A., and Gomez "gave Barragan a shank" for the job.  Response at 3.  In the Addendum, the USPO notes that Baca ordered the hit on J.M., but Gomez relayed the information, see Addendum at 2, and that Gomez closely followed

---

[23]The PSR says that "Gomez ordered the murder of M.A."  PSR ¶ 30, at 11.  In the Objections, however, Gomez suggests that this is a typographical error, because the rest of the paragraph discusses J.M., and the next paragraph discusses M.A.  See Objections at 4.  In addition, in the Addendum, the USPO treats Gomez' Objection as an Objection to the assertion that he "order[ed] the death of J.M., as noted in paragraph 30."  Addendum at 1.  The Court concludes, therefore, that the USPO, in PSR ¶ 30, at 11, means to state that Gomez ordered M.A.'s murder.

Baca and gave Barragan a shank to kill M.A, see Addendum at 2.  As explained in footnotes 11

and 12, supra, this evidence does not support the contention that Gomez ordered the hits himself.

Rather, it suggests that Baca ordered the hits on J.M. and M.A., but Gomez relayed the information

and helped to facilitate the hits.  The Court, therefore, sustains Objections (i) and (ii), because there

is insufficient evidence to conclude that Gomez himself ordered hits on J.M. and M.A.   Further,

to the extent that Gomez objects on the grounds he played no part in the SNM hits on J.M. and

M.A., however, the Court overrules Gomez' Objections.

Second, the Court overrules Objections (iii)-(vii), because the available evidence is

sufficiently reliable, and the Court may consider hearsay at the sentencing stage as long as it is

reliable.  See United States v. Ruby, 706 F.3d at 1228.  "District courts are not strictly bound by

the Federal Rules of Evidence at sentencing hearings."  United States v. Ruby, 706 F.3d at 1229

(citing United States v. Browning, 61 F.3d 752, 755 (10th Cir. 1995)).  "As a result, 'hearsay

statements may be considered at sentencing if they bear some minimal indicia of reliability.'"

United States v. Ruby, 706 F.3d at 1229 (quoting United States v. Damato, 672 F.3d 832, 847

(10th Cir. 2008)).  Gomez' Objections (iii) through (vii) -- the Objections listed in numbers 3

through the first number 6 in the Objections -- all rely on the same argument: that the USPO's

evidence is unreliable, because it comes from unidentified sources or because the source

cooperated with the United States.  See Objections at 4-5.  Gomez does not argue that there is no

evidence to support the USPO's version of the facts, but only that the evidence is unreliable.  See

Objections at 4-5.  The United States responds to each of Gomez' Objections by arguing that the

evidence on which the USPO relies is reliable.  See Response at 4-5.  As explained in footnotes

15 and 12 through 22, supra, the Court concludes the evidence on which the USPO relies is

sufficiently reliable.  See United States v. Cook, 550 F.3d 1292, 1296 (10th Cir. 2008)("[T]he due

process clause protects a defendant's right not to be sentenced on the basis of materially incorrect information."). The Court, therefore, overrules Objections (iii) through (vii).

Third, the Court sustains Objection (viii), because Gomez has accepted responsibility for his offense, and his possession of the eight-inch sharpened metal instrument does not show that he does not accept responsibility for the offense. The USPO, in the PSR, states that "it appears [Gomez] has not demonstrated an acceptance of responsibility based on his on-going criminal behavior." PSR ¶ 64, at 17. The USPO notes that an eight-inch sharpened metal instrument was found in Gomez' cell on November 10, 2020 and, because this "conduct is similar to the underlying overt acts of the racketeering activity," PSR ¶ 63, at 17, and because it "occurred after the defendant's change of plea on September 25, 2020," PSR ¶ 63, at 17, Gomez "has exhibited a pattern of possessing weapons while incarcerated, dating back to 2002," so he has not accepted responsibility. Addendum at 7. Gomez argues that his possession of this metal instrument does not preclude a finding of acceptance of responsibility, because the "weapon was not in his possession [or] being used in an offense manner." Objections at 6. Moreover, Gomez stresses that, because Gomez entered a guilty plea a month before the weapon was found, "he could have been perceived as [a government cooperator] based solely on his change of plea, loose talk about discovery, or other rumors." Objections at 7. Gomez also maintains that he "has disassociated himself from SNM and its activities, notwithstanding the dangers" that exist while Gomez is incarcerated. Objections at 9. The United States "takes no position" whether Gomez accepts responsibility, because the Court "is familiar with how, why, and when SNM members maintain and use weapons." Response at 6.

The Court concludes, by a preponderance of the evidence, that Gomez has accepted responsibility for his offense. Gomez has withdrawn from his associations with SNM, <u>see</u>

Objections at 9, and admits that he participated in SNM and helped to further its goals, see Plea
Agreement, filed September 25, 2020 (Doc. 80).  The Commentary to U.S.S.G. § 3E1.1 states:
"Entry of a plea of guilty prior to the commencement of trial combined with truthfully admitting
the conduct comprising the offense of conviction" constitutes "significant evidence of
responsibility."  U.S.S.G. § 3E1.1, cmt. n.3.  On their own, the contents of the Plea Agreement
indicate that Gomez acknowledges his participation in SNM and recognizes that it was unlawful.
See Plea Agreement at 1-9.  The larger issue -- and the one that makes the USPO decline to give
Gomez U.S.S.G. § 3E1.1(a)'s the 2-level reduction -- is whether Gomez' possession of the eight-
inch sharpened metal instrument on November 10, 2020, shows that Gomez has not accepted
responsibility.  See Addendum at 7.

The Sentencing Guidelines "do not prohibit a sentencing court from considering, in its
discretion, criminal conduct unrelated to the offense of conviction in determining whether a
defendant qualifies for an adjustment for acceptance of responsibility under" U.S.S.G. § 3E1.1(a).
United States v. Prince, 204 F.2d at 1024.  Moreover, in most circumstances, other criminal
conduct, "whatever its nature, is a powerful indicium of a lack of contrition."  United States v.
Jordan, 549 F.3d 57, 61 (1st Cir. 1008).  Gomez' offense is not for assault, battery, or possessing
a dangerous weapon, however.  See Plea Agreement at 1-9.  Gomez pled to racketeering
conspiracy, in violation of 18 U.S.C. § 1962(d).  See Plea Agreement at 2.  Moreover, because this
offense is related to SNM, Gomez' possession of a weapon in his cell after entering a Plea
Agreement does not demonstrate that he has not accepted responsibility.  SNM has a history of
attacking people who defect or testify against it.  See PSR ¶¶ 11-15, at 7-8.  Here, for example,
Gomez was involved in J.M.'s murder, because J.M. was cooperating with law enforcement.  See
PSR ¶ 30, at 11.  Gomez had earlier participated in attacking SNM members for their cooperation

with law enforcement, so he justifiably feared a similar attack, even if Gomez "does not intend on cooperating with the Government."   Objections at 7.   Gomez' possession of the eight-inch sharpened metal instrument does not mean, therefore, that he has not accepted responsibility. There is no evidence that Gomez has continued to further SNM's aims.  See PSR ¶¶ 1-154, at 1-31.   Consequently, because the Plea Agreement was "prior to the commencement of trial," U.S.S.G. § 3E1.1(a) cmt. n.3, and because Gomez "truthfully admit[s] the conduct comprising the offense of conviction," U.S.S.G. § 3E1.1(a) cmt. n.3, and because he voluntarily terminated his active participation in SNM, Gomez "clearly demonstrates acceptance of responsibility for his offense," U.S.S.G. § 3E1.1(a).  See United States v. Gauvin, 173 F.3d at 806 (concluding that a defendant who admit to having engaged in the charged conduct may be entitled to a U.S.S.G. § 3E1.1(a) reduction).   Gomez is entitled, therefore, to a 2-level sentencing reduction.  See U.S.S.G. § 3E1.1(a).

**IT IS ORDERED** that the Objections in the Defendant's Objections to PSR, filed February 10, 2021 (Doc. 93), are sustained in part and overruled in part.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred J. Federici
    Acting United States Attorney
Maria Ysabel Armijo
Randy M. Castellano
Ryan Ellison
    Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

    *Attorneys for the Plaintiff*

Keren H. Fenderson
Fenderson Law Firm
Albuquerque, New Mexico

--and--

Harry I. Zimmerman
Harry Ira Zimmerman Attorney at Law
Albuquerque, New Mexico

*Attorneys for the Defendant*